IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Lou Brenckman,        :
             Petitioner    :
                         :
       v.                 :
                         :
Department of Human Services,    :    No. 443 C.D. 2018
             Respondent    :    Submitted: September 9, 2019


BEFORE:    HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE ROBERT SIMPSON, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                        FILED: October 1, 2019


Mary Lou Brenckman (Brenckman) petitions this Court for review of the Department of Human Services (DHS) Secretary's (Secretary) March 1, 2018 Final Order upholding the Bureau of Hearings and Appeals' (BHA) Final Administrative Action Order denying Brenckman's appeals. The sole issue for this Court's review is whether the BHA erred by denying Brenckman's undue hardship waiver applications (Applications). After review, we affirm.

The facts of this case are not disputed. In May 2014, Brenckman was hospitalized due to injuries from a fall. On July 18, 2014, Brenckman was transferred to hospice care at Zerbe Sister Nursing Center (ZSNC) because her health was declining. In July 2015, doctors re-evaluated Brenckman's condition, removed her from hospice care and admitted her to a ZSNC cottage, where a private caregiver lived with her for a month as she underwent therapy. *See* Reproduced Record (R.R.)

at 39a-42a.  Thereafter, Brenckman was admitted to ZSNC's Long Term Care (LTC) facility (Facility) to receive skilled nursing care.

Between April 10, 2012 and August 31, 2016, Brenckman's son and purported power-of-attorney (POA), Allan Brenckman (Son), withdrew $159,394.02 of Brenckman's assets to cover his living expenses.[1]  With the money that remained, Brenckman paid ZSNC for her care from July 2014 until "funds to pay for her care were exhausted as of [November 13, 20]16."  R.R. at 95a.  It was then that Son "realized the huge error he committed in 'borrowing' his mother's funds.  The money was entirely gone, and [Brenckman] would need to apply for [Medical Assistance

---

[1] Although not record evidence, Brenckman represents in her brief to this Court that she made Son her POA and executed a will leaving her entire estate to him before she entered hospice care.  *See* Brenckman Br. at 5.  For the first time in her brief to this Court, she further describes that Son ignored the operation of his landscape business to remain by her side during what Son believed were her final days, and his business suffered as a result.  *See* Brenckman Br. at 5-6.

> Still refusing to leave [Brenckman's] side, [Son] made a decision that has proven to be a costly mistake.  Realizing that [Brenckman] had a significant estate, and with the knowledge that the entire estate was coming to him when she would soon perish, [Son] decided that he would begin using [Brenckman's] funds through the use of the [POA] from [Brenckman] to pay for his own living expenses.  [Son's] thought was that all of the money would soon be his[;] he would rather use the money now to be by [Brenckman's] side.  So, [Son] decided to 'borrow' [Brenckman's] funds to pay for his own living expenses.  Certainly, there were enough funds there to cover the time he needed to stay with [Brenckman].
>
> As the story unfolds, [Brenckman] did not die.

Brenckman Br. at 6.
The BHA's decision is limited to the record before it.  *See* Section 275.4(g)(6), (h)(2) of DHS' Regulations, 55 Pa. Code § 275.4(g)(6), (h)(2).  Moreover, "[i]t is well-settled that the Court may not consider information attached to a brief but not part of the certified record." *Henderson v. Unemployment Comp. Bd. of Review*, 77 A.3d 699, 714 n.6 (Pa. Cmwlth. 2013).  Because Brenckman raised these facts for the first time in her brief to this Court, we will not consider them.

2

(MA)[2]] to pay for her necessary care."[3] Brenckman Br. at 7. Brenckman still resides at the Facility.

On January 5, 2017, the Lancaster County Assistance Office (CAO) received Brenckman's MA/LTC benefits application seeking MA from November 13, 2016. After a hearing, on June 21, 2017, the CAO determined that Brenckman was ineligible for MA/LTC benefits for a period of time[4] because $159,394.02 of her assets had been transferred in the previous five years, primarily to Son, for less than fair market value (FMV).[5] Son appealed from the CAO's ineligibility assessment. As of the date the BHA's hearing record was closed in the instant matter, the MA/LTC ineligibility appeal had not been adjudicated.

On June 28, 2017, Son authorized ZSNC to submit the Applications on Brenckman's behalf and, on June 30, 2017, ZSNC submitted the Applications to the CAO. Therein, Son disclosed that $159,394.02 of Brenckman's assets had been withdrawn, and are not recoverable.[6] Son declared that, "as a result of [Brenckman's]

---

[2] MA is also known as Medicaid.

[3] "Medicaid is a cooperative federal-state program that provides medical care to needy individuals." *Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606, 610 (2012). "Pursuant to Section 442.1 of the [Human Services] Code, Act of June 13, 1967, P.L. 31, *as amended*, . . . added by Act of July 31, 1968, P.L. 904[, 62 P.S. § 442.1], [DHS] is authorized to establish eligibility standards for the medically needy." *Steinberg v. Dep't of Pub. Welfare*, 758 A.2d 734, 734 n.1 (Pa. Cmwlth. 2000).

[4] The specific ineligibility period was not made a part of this record.

[5] Section 178.2 of DHS' Regulations defines FMV as "[t]he price which property can be expected to sell for on the open market or would have been expected to sell for on the open market in the geographic area in which the property is located." 55 Pa. Code § 178.2.

"During the period of ineligibility for MA payment for [nursing facility care], the nursing facility . . . may charge the private pay rate." 55 Pa. Code § 178.104(h).

[6] In one Application, Son declared that $24,000.00 of Brenckman's assets, representing insurance policy proceeds paid to her upon her husband's 2011 death, had been distributed from a joint account between April 10, 2012 and January 28, 2014, prior to Brenckman's 2014 fall. *See* R.R. at 8a-9a. In the other Application, Son asserted that he removed $135,394.02 of Brenckman's assets from his joint account with Brenckman between July 3, 2014 and August 31, 2016 to

3

fall and related injuries, [Brenckman] require[d] 24[-hour,] 7 days a week care. She [wa]s unable [to] walk, her comprehension and verbal communication [were] poor and [her] health [wa]s failing. She must be cared for in a full[-]time skilled care facility." R.R. at 9a; Certified Record (C.R.) Item 3, Ex. C-1 at 2.

The CAO forwarded the Applications to DHS' Bureau of Policy (BOP) for a determination. On July 11, 2017, the BOP informed the CAO that the Applications were denied. On July 21, 2017, DHS' Office of Income Maintenance (OIM) notified Brenckman that the Applications were denied. On July 26, 2017, Son appealed from the denials.

A hearing was conducted on the denials before an Administrative Law Judge (ALJ) on September 17, 2017. On October 16, 2017, the ALJ denied Brenckman's appeal because "[n]o evidence was provided to establish that [Brenckman] was evicted, deprived of medical care, food, shelter, or that her life is endangered[,]" and "[n]o evidence was provided to establish [that] the imposition of the period of ineligibility for MA/LTC benefits deprived [Brenckman] of necessary care, medical services, or the necessities of life." Brenckman Br. App. A, ALJ Adjudication at 13. On October 24, 2017, the BHA affirmed the ALJ's Adjudication. *See* Brenckman Br. App. A, BHA Final Administrative Action Order. On November 8, 2017, Brenckman filed an application seeking reconsideration, which the Secretary granted on November 16, 2017. On March 1, 2018, the Secretary issued the Final Order upholding the BHA's Final Administrative Action Order. Brenckman appealed to this Court.[7]

---

maintain his business after Brenckman's 2014 fall. *See* Certified Record Item 3, Ex. C-1 at 1-2. The latter Application was not included in the reproduced record.

[7] "Our review requires that we determine whether [DHS'] adjudication comports with the applicable law, whether its findings are supported by substantial evidence, and whether any constitutional rights were violated." *Steinberg*, 758 A.2d at 736 n.3.

Preliminarily, "[t]he [MA] program is a cooperative state-federal program which requires participating states to comply with federal law applicable to the program." *Geriatric & Med. Servs., Inc. v. Dep't of Pub. Welfare*, 616 A.2d 746, 748 n.1 (Pa. Cmwlth. 1992). Section 1917(c) of the Social Security Act requires, in relevant part:

> (1)(A) In order to meet the requirements of this subsection . . . , the State plan must provide that **if an institutionalized individual . . . disposes of assets for less than** [**FMV**] **on or after the look-back date specified in subparagraph** [**(1)**]**(B)(i), the individual is ineligible for** [**MA**] for [nursing facility] services . . . during the period beginning on the date specified in subparagraph [(1)](D) and equal to the number of months specified in subparagraph [(1)](E).
>
> . . . .
>
> (2) An **individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that**--
>
> . . . .
>
> (D) the State determines, under procedures established by the State (in accordance with standards specified by the Secretary), that **the denial of eligibility would work an undue hardship** as determined on the basis of criteria established by the Secretary.
>
>> The procedures established under subparagraph [(2)](D) shall permit the facility in which the institutionalized individual is residing to file an undue hardship waiver application on behalf of the individual with the consent of the individual or the personal representative of the individual.[8]
>
> While an application for an undue hardship waiver is pending under subparagraph [(2)](D) in the case of an individual who is a resident of a nursing facility, if the application meets such criteria as the Secretary specifies,

---

[8] *See also* Section 178.104b(c) of DHS' Regulations, 55 Pa. Code § 178.104b(c).

the State may provide for payments for nursing facility services in order to hold the bed for the individual at the facility, but not in excess of payments for 30 days.

42 U.S.C. § 1396p(c) (emphasis added).

"The requirements of [Section 1917(c) of the Social Security Act,] 42 U.S.C. § 1396p(c) [(relating to asset transfers)] have been recognized and adopted by [DHS]." *Geriatric & Med. Servs.*, 616 A.2d at 748 n.2. Accordingly, "in order to participate in the MA program, the Commonwealth is required to impose a period of ineligibility for MA/LTC benefits on institutionalized individuals who transfer assets for less than FMV within a five-year look-back period. 55 Pa. Code § 178.104."[9] *Colonial Park Care Ctr., LLC v. Dep't of Pub. Welfare*, 123 A.3d 1094, 1097 (Pa. Cmwlth. 2015). The "applicant bears the burden of establishing eligibility for [MA]." *Steinberg v. Dep't of Pub. Welfare*, 758 A.2d 734, 736 (Pa. Cmwlth. 2000).

Thus, in Pennsylvania,

[i]n order to prevent an applicant from improperly disposing of otherwise available assets to qualify for [MA], certain transfers of assets affect eligibility. [DHS'] [R]egulations

---

[9] Section 178.2 of DHS' Regulations defines "look-back date/look-back period" as "[t]he specified period of time immediately before the date of an institutionalized individual's application for MA benefits which determines the earliest date on which a transfer of assets for less than FMV can result in ineligibility for MA." 55 Pa. Code § 178.2. Section 178.104(c) of DHS' Regulations declares that the look-back date "shall be 36 months from the date on which the individual is both institutionalized and has applied for MA, except in the case of payments from a trust . . . [when] the look-back date shall be 60 months." 55 Pa. Code § 178.104(c). However, in Section 178.104a(a) of its Regulations (entitled "Clarification of fair consideration provisions for disposition of assets made on or after February 8, 2006--statement of policy," adopted in 2007), DHS clarifies that "[c]onsistent with [S]ection 1917(c)(1)(B)(i) of the Social Security Act[, 42 U.S.C § 1396p(c)(1)(B)(i),]. . . regarding . . . transfers of assets, effective for an application made on or after March 3, 2007, the look-back period for assets transferred on or after February 8, 2006, shall be 60 months." 55 Pa. Code § 178.104a(a). Because Brenckman's assets at issue here were transferred after February 8, 2006, and her MA application was filed after March 3, 2007, the applicable look-back period is 60 months. Thus, Brenckman's look-back period was the 60 months preceding her January 5, 2017 MA application (*i.e.*, January 5, 2012 to January 5, 2017).

provide a 'look-back' period of [60] months from the date an applicant is both institutionalized and has applied for [MA]. 55 Pa. Code § 178.104(c). If an applicant disposes of assets for less than [FMV] during the 'look-back' period, [DHS] presumes that the transfer was made to qualify for [MA]. The applicant may rebut the presumption by establishing that the individual intended to dispose of the assets for [FMV], the assets were transferred exclusively for a purpose other than to qualify for [MA],[10] or the assets transferred for less than [FMV] were returned to the applicant. 55 Pa. Code § 178.10[5].

*Steinberg*, 758 A.2d at 736. "If the applicant fails to rebut the presumption, then [she] will be disqualified from receiving MA for a period equal to the number of months of average nursing home care that the transferred assets could have purchased."[11] *Colonial Park Care Ctr.*, 123 A.3d at 1097. Moreover, "[d]uring the period of ineligibility for MA payment for [nursing facility care], the nursing facility . . . may charge the private pay rate." 55 Pa. Code § 178.104(h).

Here, on June 21, 2017, Brenckman was declared ineligible for MA/LTC benefits for a period of time because $159,394.02 of her assets were transferred during the look-back period for less than FMV. This Court does not know the status of Brenckman's appeal from that ruling. Notwithstanding, Section 1917(c)(2)(D) of the Social Security Act, adopted by DHS, states that **Brenckman may nevertheless be eligible for MA *if* "the denial of eligibility would work an undue hardship**[.]"

---

[10] In order to establish that the asset in question was transferred solely for some purpose other than to qualify for MA, proof of the following is required: 1) purpose of transfer; 2) attempts to dispose of asset at its FMV; 3) reason for accepting less than FMV; 4) plan for self-support post-transfer; and 5) transferor's relationship to transferee. 55 Pa. Code § 178.105(c)[].

*Colonial Park Care Ctr.*, 123 A.3d at 1101.

[11] *See* Section 1917(c)(1)(E) of the Social Security Act, 42 U.S.C. § 1396p(c)(1)(D); *see also* Sections 178.104(d) and 178.104a(d) of DHS' Regulations, 55 Pa. Code §§ 178.104(d), 178.104a(d).

42 U.S.C. § 1396p(c)(2)(D) (emphasis added). The Applications were filed to vacate the ineligibility period based on undue hardship.

Section 178.2 of DHS' Regulations specifies that such undue hardship "[e]xists when denial of MA would deprive the individual of medical care and endanger the individual's health or life; also exists when the individual . . . would be deprived of food, clothing, shelter or other necessities of life." 55 Pa. Code § 178.2. DHS states in Section 178.104b(a) of its Regulations (entitled "Clarification of fair consideration provisions for disposition of assets made on or after February 8, 2006--statement of policy," adopted in 2007 and amended in 2011):

> For the purposes of this statement of policy, **an undue hardship exists when application of the transfer of assets penalty provision would deprive the individual of one of the following:**
>
> > **(1) Medical care so that the individual's health or life would be endangered.**
> >
> > **(2) Food, clothing, shelter or other necessities of life.**

55 Pa. Code § 178.104b(a) (emphasis added). This Court has ruled that "**the applicant in the undue hardship waiver appeal must offer evidence pertinent to the circumstances surrounding the transfer of assets during the look-back period**." *Colonial Park Care Ctr.*, 123 A.3d at 1100 (emphasis added).

OIM did not explain in its July 21, 2017 notice why Brenckman's Applications were denied. Rather, it merely informed her:

> You previously received a notice stating you would not qualify for payment of [LTC] facility services for a certain time period because you gave away or transferred assets for less than [FMV]. You requested an undue hardship waiver.

8

**Your request for an undue hardship waiver is denied.**[12]
You remain eligible for all other [MA] benefits.

Citations: 42 U.S.C. § 1396p(c) and 55 Pa. Code § 178.104a

R.R. at 14a (emphasis added).

At the September 17, 2017 ALJ hearing, CAO OIM Caseworker Jerry Gehman (Gehman) testified that his office received the BOP's denial on July 21, 2017. He explained that, although CAO does not offer input in the undue hardship assessment process, the BOP "use[s] the facts that [CAO] found during the establishment of eligibility. But [the BOP] use[s] [its] own reasoning in denying the application for undue hardship." R.R. at 112a. Gehman stated:

> [The BOP's] reasoning is as follows[:] The Long-Term Care Chapter 440 states that all circumstances related to the Undue Hardship Waiver request must be evaluated to determine if the individual would be deprived of medical care that would endanger the individual's health or life or deprive the individual of . . . food, clothing, shelter or other necessities of life. This includes evaluating if an . . . unexpected illness or injury occurred after the transfer of the assets. . . .
>
> In Pennsylvania, the MA form 401 Admissions Notice Packet [(MA 401)] is given to all individuals as they enter a[n LTC] facility, whether they are applying for MA or not. Part two of the MA 401 clearly states that a[n LTC] facility resident may be found ineligible for payment of [LTC] services if assets are gifted.
>
> [Son] signed the application for [MA/LTC] on 12/27/2016, and would have been made aware of the ramifications of such transfers on [Brenckman's] eligibility.

---

[12] At the ALJ hearing, DHS' CAO OIM Caseworker Jerry Gehman represented that the parties "discussed how the decision [wa]s arrived at," R.R. at 109a, and "there [was] no room for a change" from the undue hardship decision. R.R. at 110a.

9

For those reasons, it is [DHS'] decision to deny the Undue Hardship Waiver request for [Brenckman].

I can only summarize that it's the [BOP's] stance then that . . . any hardship situation that . . . your mother may have been placed in in this situation doesn't fit the definition of undue in the [BOP's] opinion. Because . . . it was the actions . . . that you took that put her in . . . that position, after you were already informed . . . those actions . . . were against policy and were against [MA] eligibility rules when she was admitted to the [F]acility [and] . . . you were informed of . . . the rules when the MA 401 packet was – was explained to you and . . . when you signed the application and agreed to the eligibility rules.

R.R. at 112a-114a.

Son testified:

My mom is being well-taken care of right now at the [Facility]. If . . . she were [sic] not able to be there, there's no place else for her to go. I can't bring her home. I don't have . . . the facilities, number one. I don't have the . . . money to support her. That's all part of what the hearing was last time, in terms of how all of this got to the point where it is.

But the long and short of it is she . . . just has nowhere to go to receive the care that she needs. And so I wanted [ZSNC's Community Care Coordinator Stefanie Miley (Miley)] to make sure that she represented the [Facility's] position on that.

R.R. at 126a.

Miley testified that Brenckman came to ZSNC in July 2014. She produced Brenckman's physician's orders reflecting that Brenckman's condition was deteriorating, and she required the services of a skilled nursing care facility. Miley reported that, according to Brenckman's doctors, her prognosis for rehabilitation potential was poor, and she may not ever return home or be discharged. *See* R.R. at 119a; *see also* R.R. at 18a-23a, 75a. She stated that Brenckman requires care 24

hours per day, 7 days per week, with the physical assistance of at least one person for all but a few activities that require either two people and/or mechanical lifts "which cannot be provided outside of [the Facility]." R.R. at 120a.

Miley declared that, "[ZSNC] can't continue to keep [Brenckman] [at the Facility] without payment of some sort, but she does require the care." R.R. at 120a. Miley presented ZSNC's bill for Brenckman's care from January 2017 until the September 2017 ALJ hearing totaling $104,783.54. *See* R.R. at 121a; *see also* R.R. at 13a (Facility Statement).[13] She explained that the Facility has not been paid since January "on good faith that this would be resolved[,]" but "if . . . this does not get resolved and the [LTC] benefits continue to be deprived, the [Facility] will not be able to keep [Brenckman]. . . . So . . . our position is that will then create the undue hardship."[14] R.R. at 126a-127a; *see also* R.R. at 128a.

Based upon the evidence presented, the ALJ concluded, and the BHA and the Secretary agreed:[15]

> No evidence was provided to establish that [Brenckman] was evicted, deprived of medical care, food, shelter, or that her life is endangered.

---

[13] Although the Facility Statement is unmarked in the record, it was clearly referred to in the ALJ notes of testimony as Exhibit A-4. *See* R.R. at 107a, 123a-124a.

[14] Section 201.29(f) of Pennsylvania's Department of Health's (DOH) Regulations states, in pertinent part: "**The resident shall be transferred or discharged** only for medical reasons, for [her] welfare or that of other residents or **for nonpayment of stay if the facility has demonstrated reasonable effort to collect the debt**." 28 Pa. Code § 201.29(f) (emphasis added). Section 201.29(g) of DOH's Regulations provides, in relevant part, that "the facility is responsible to assure that appropriate arrangements are made for a safe and orderly transfer and that the resident is transferred to an appropriate place that is capable of meeting the resident's needs." 28 Pa. Code § 201.29(g).

[15] "[T]he [ALJ], as the fact-finder, is charged with the responsibility of resolving conflicts in testimony and may reject the testimony of any witness." *Godown v. Dep't of Pub. Welfare*, 813 A.2d 954, 958 (Pa. Cmwlth. 2002).

11

Furthermore, no evidence was provided to establish [that] the imposition of the period of ineligibility for [MA/]LTC benefits deprived [Brenckman] of necessary care, medical services, or the necessities of life. Therefore, because [Brenckman] did not meet [the] criteria set forth under [the R]egulations, she is not eligible to receive an [unnecessary hardship waiver].

ALJ Adjudication at 12-13.

Brenckman argues that the BHA "erred in its interpretation of [Section 178.2 of DHS' Regulations,] 55 Pa. Code § 178.2[,] wherein it ruled that because [Brenckman] was already receiving care from [ZSNC] . . . , [Brenckman] was not suffering undue hardship under the [Regulations]." Brenckman Br. at 11. Brenckman asserts that the BHA's interpretation would require ZSNC to eject her from the Facility before she could demonstrate the hardship necessary to meet the waiver criteria, which is not consistent with DHS' Regulations.[16] Accordingly, Brenckman claims that the determination of whether she qualified for an undue

---

[16] The skilled nursing facility in *Colonial Park* made the same argument:

[T]he Chief ALJ erred in interpreting the undue hardship [R]egulations to require that a resident demonstrate physical deprivation of medical care or necessities of life when no one admitted to a skilled nursing facility could ever qualify for a waiver on that basis. In support, it cites the [DOH's] [R]egulation providing that a facility may not discharge a nursing home resident involuntarily, even for non-payment, unless he or she is transferred to a place that can continue to meet his or her current medical care and other needs. [*See* Section 201.29(g) of DOH's Regulations,] 28 Pa. Code § 201.29(g). To that end, Colonial Park maintains that the Chief ALJ's literal interpretation of the undue hardship language as requiring physical hardship renders the waiver meaningless and deprives [the resident] of due process.

*Colonial Park Care Ctr.*, 123 A.3d at 1099. However, this Court did not specifically address that issue.

12

hardship waiver should have been made as of the time she entered the Facility, rather than when the BHA's ruling was issued.

In one Application, Son stated that $24,000.00 of Brenckman's assets, representing proceeds from his deceased father's life insurance,[17] was gifted to him and other family members between April 10, 2012 and January 28, 2014 prior to Brenckman's July 2014 fall. *See* R.R. at 9a. In the other Application, Son admitted that, between July 3, 2014 and August 31, 2016, he withdrew a total $135,394.02 from his joint account with Brenckman "to operate [his] business while [Brenckman] was in and out of the hospital, [h]ospice and skilled care."[18] C.R. Item 3, Ex. C-1 at

---

[17] Brenckman's husband/Son's father passed away in 2011. *See* R.R. at 118a.

[18] It is unclear based on this record whether Son withdrew the money with Brenckman's express consent, in his capacity as Brenckman's POA, or whether Son removed the money from a joint account Brenckman and he co-owned. In the Applications, Son represented that the money was withdrawn from a joint account he co-owned with Brenckman. However, in Brenckman's brief to this Court, she refers to Son *borrowing her* funds. No evidence was presented to the ALJ of either circumstance.

Section 5601.4(a)(2) of the Probate, Estates and Fiduciaries Code (Code) states: "An agent under a [POA] may [make a gift] only if the [POA] expressly grants the agent the authority and exercise of the authority is not otherwise prohibited by another agreement or instrument to which the authority or property is subject[.]" 20 Pa.C.S. § 5601.4(a)(2). In addition,

> [a]n agent may make a gift of the principal's property only as the agent determines is consistent with the principal's objectives if actually known by the agent and, if unknown, as the agent determines is consistent with the principal's best interest based on all relevant factors, including:
>
> (i) The value and nature of the principal's property.
>
> (ii) The principal's foreseeable obligations and need for maintenance.
>
> . . . .
>
> (iv) Eligibility for a benefit, program or assistance under a statute or regulation.

2.  Son further represented in the Application that "[his] business . . . failed due to [Son] not being available to his clients during these time periods." *Id.* Before this Court, Brenckman argues that her assets were exhausted "[t]hrough no fault of her

---

> (v) The principal's personal history of making or joining in making
> gifts.

20 Pa.C.S. § 5601.4(d) (emphasis added).

The subject POA is not part of this record. Thus, this Court is not aware of the specific parameters of Son's authority to gift Brenckman's money. Nevertheless, the parties do not dispute that Son was Brenckman's agent. Section 5601(f) of the Code defines "agent" as "[a] person designated by a principal in a [POA] to act on behalf of that principal." 20 Pa.C.S. § 5601(f). As Brenckman's POA, Son as her agent was generally bound by Section 5601.3(a) of the Code to "**[a]ct . . . in the principal's best interest**[,]" 20 Pa.C.S. § 5601.3(a) (emphasis added) and,

> [e]xcept as otherwise provided in the [POA], . . . :
>
> (1) Act loyally for the principal's benefit.
>
> (1.1) Keep the agent's funds separate from the principal's funds unless:
>
> (i) the funds were not kept separate as of the date of the execution of the [POA]; . . .
>
> . . . .
>
> (6) **Attempt to preserve the principal's estate plan**, to the extent actually known by the agent, **if preserving the plan is consistent with the principal's best interest based on all relevant factors, including**:
>
> (i) The value and nature of the principal's property.
>
> (ii) **The principal's foreseeable obligations and need for maintenance**.
>
> . . . .
>
> (iv) **Eligibility for** a benefit, program or **assistance under a statute or regulation**.

20 Pa.C.S. § 5601.3(b) (emphasis added).

14

own. That fact alone supports the need for the undue hardship waiver."[19] Brenckman Br. at 11.

Unless rebutted, the law presumes that Son's withdrawals of $159,394.02 of Brenckman's assets between April 10, 2012 and August 31, 2016 were made solely so Brenckman would qualify for MA. *Steinberg*. DHS determined that the evidence provided during the MA hearing was not sufficient to overcome that presumption. Accordingly, DHS declared Brenckman ineligible for MA for a period of time.

Notwithstanding, if Brenckman established on the record "circumstances surrounding the transfer of assets during the look-back period," *Colonial Park Care Ctr.*, 123 A.3d at 1100, *and* that she would suffer an undue hardship – such that she would be deprived of necessary medical care, food, clothing or shelter – as a result of DHS imposing the ineligibility period, the penalty could be waived. *See* 42 U.S.C. § 1396p(c)(2)(D); 55 Pa. Code § 178.104b(a). Here, the ALJ determined, and the BHA and the Secretary agreed, that since substantial evidence supported that Brenckman has received necessary round-the-clock skilled nursing care at the Facility since July 2015, and would continue to do so until ZSNC transferred her to another facility for lack of payment, there is no record basis for an undue hardship waiver. ZSNC may only transfer Brenckman, even for non-payment, to a place that can care for her medical needs and other life necessities. *See* Section 201.29(g) of Pennsylvania Department of Health's (DOH) Regulations, 28 Pa. Code § 201.29(g).

---

[19] "An agent cannot make any gift under [a POA] unless the [POA] specifically states the agent is authorized to do so." *In re Estate of Moskowitz*, 115 A.3d 372, 386 (Pa. Super. 2015). The parties do not allege that Son acted contrary to his responsibilities as Brenckman's agent. Thus, if Brenckman either expressly permitted Son to take the money, or he was authorized to do so under the POA, her assets were arguably exhausted by her own hand.

This Court does not have the benefit of the record created in the MA case. Nor did Brenckman or Son present any evidence at the ALJ hearing "pertinent to the circumstances surrounding the transfer of assets during the look-back period." *Colonial Park Care Ctr.*, 123 A.3d at 1100. Rather, the only evidence they offered consisted of proof that Brenckman has received the skilled nursing care she requires, such that Brenckman has not suffered undue hardship as a result of DHS imposing the ineligibility period due to Son using assets that could have been used to pay ZSNC for Brenckman's LTC. Accordingly, the Secretary properly held that Brenckman is not entitled to an undue hardship waiver.

This Court acknowledges that since ZSNC continues to provide Brenckman necessary care during the ineligibility period, Brenckman is hard-pressed to establish undue hardship. However, the circumstances presented in this case do not implicate an undue hardship waiver. Brenckman is receiving and will continue to receive necessary care.[20] Even if ZSNC found it necessary to transfer Brenckman to another facility, ZSNC is legally mandated to transfer Brenckman to a place that can provide the care she requires. *See* Section 201.29(f), (g) of DOH's Regulations, 28 Pa. Code § 201.29(f), (g). In addition, Brenckman had assets that would have paid for such care, but for Son using her funds for himself.[21] Now, Son is asking for Commonwealth taxpayers to pay the Facility for a period of time that the funds he

---

[20] Although ZSNC is temporarily financially deprived for keeping Brenckman in its care under these circumstances, according to DHS, "under Pennsylvania law, the [Facility] has the authority to file an action against [Son] to collect the unpaid bill. *See* [Section 4603(a)(1)(ii) of the Domestic Relations Code,] 23 Pa.C.S. § 4603(a)(1)(ii)." There is no record evidence that ZSNC has taken any such action. DHS Br. at 9.

[21] Son used funds available for Brenckman's LTC, possibly as early as April 2012, but definitely as of July 2014, and continued to do so for up to another year after it was clear that Brenckman was going to live and would require LTC. If Son signed Brenckman's MA 401 as the BHA found, he was well aware that using her available funds could jeopardize her future eligibility for MA.

used would have covered Brenckman's care. However, the law is clear that "[DHS] is the payer of last resort under the Commonwealth's statutory scheme. 55 Pa. Code § 178.6(a)." *Colonial Park Care Ctr.*, 123 A.3d at 1097.

Brenckman urges this Court to consider her undue hardship waiver qualification as of the date she entered the Facility. However, the relevant portions of Section 1917(c) of the Social Security Act (*e.g.*, "the denial of eligibility *would* work an undue hardship[]" 42 U.S.C. § 1396p(c)(2)(D)) (emphasis added), and Section 178.104b(a) of DHS' Regulations (*e.g.*, "*would* deprive the individual of one of the following[]" 55 Pa. Code § 178.104b(a) (emphasis added)), are written in the future tense. Thus, Congress intended for, and DHS properly did consider, current *and* future conditions when assessing undue hardship.

Even if, as Brenckman argues, DHS assessed Brenckman's qualification for the undue hardship waiver as of the date she entered the Facility, she would not meet the waiver requirements. When Brenckman entered the Facility in July 2015, she had spent one year in hospice care, one month with live-in help and she still had sufficient funds remaining to pay for her LTC for 2½ years thereafter. Therefore, viewing Brenckman's situation as of when she was admitted into the Facility, DHS' "application of the transfer of assets penalty [did not] deprive [Brenckman] of . . . (1) [m]edical care so that [her] health or life would be endangered[; or] (2) [f]ood, clothing, shelter or other necessities of life." 55 Pa. Code § 178.104b(a).

For the above reasons, the Secretary's Final Order is affirmed.

_____
ANNE E. COVEY, Judge

17

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mary Lou Brenckman,        :
        Petitioner     :
                        :
                        :
        v.             :
                        :
Department of Human Services,  :    No. 443 C.D. 2018
        Respondent   :

## O R D E R

AND NOW, this 1st day of October, 2019, the Department of Human Services Secretary's March 1, 2018 Final Order is affirmed.

_____
ANNE E. COVEY, Judge